**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | |
|---|---|
| NEBRASKA INVESTMENT COUNCIL, individually and on behalf of all others similarly situated, | **CASE NO:** |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | |
| FIDELITY NATIONAL INFORMATION SERVICES, INC., GARY NORCROSS, JAMES WOODALL, and STEPHANIE FERRIS, | **DEMAND FOR A JURY TRIAL** |
| Defendants. | |

Plaintiff Nebraska Investment Council ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Fidelity National Information Services, Inc. ("Fidelity National" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on Fidelity National's website concerning the Company's public statements; (d) interviews of former

employees of Fidelity National; and (e) review of other publicly available information concerning the Company and the Individual Defendants (as defined herein).

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of all persons or entities who purchased Fidelity National common stock between May 7, 2020 and February 10, 2023, inclusive (the "Class Period"), against Fidelity National and certain of its officers (collectively "Defendants") seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act").

2.    Fidelity National provides payment processing products and services to financial institutions and other types of companies.  The Company offers its solutions in three primary segments: (1) Merchant Solutions; (2) Banking Solutions; and (3) Capital Market Solutions.  The Merchant Solutions segment accounted for approximately 30% of the Company's total revenue in 2021, and serves merchants by enabling them to accept, authorize, and settle electronic payment transactions.

3.    By 2019, large payment processing companies that had traditionally serviced banks, such as Fidelity National, competed with one another to grow via acquisitions, to achieve scale, and to combine their legacy operations with merchant-focused businesses. For instance, in January 2019, the Company's rival Fiserv announced a $22 billion deal to acquire First Data, a large merchant services provider.  In March 2019, Fidelity National addressed these competitive concerns by announcing its own deal to acquire merchant payment provider Worldpay, Inc. ("Worldpay") in a $43 billion merger.  Fidelity National claimed that the combined company would "bring the most modern solutions targeted at

the highest growth markets." After Fidelity National completed the acquisition in July 2019, Worldpay became part of the Merchant Solutions segment.

4.     This action is about how Defendants lied to investors about the success of Fidelity National's post-merger integration with Worldpay and the performance of the Merchant Solutions segment during the Class Period. Specifically, Defendants misled investors by: (1) touting the benefits of the Worldpay integration for the Company; (2) claiming that Fidelity National had "successfully completed the Worldpay integration"; (3) downplaying competition concerns in the Merchant Solutions segment; and (4) materially overstating the Company's earnings or materially understating the Company's net losses by improperly accounting for Worldpay's goodwill in violation of U.S. Generally Accepted Accounting Principles ("GAAP"). As a result, Defendants' positive statements about the Company's business, operations, and prospects during the Class Period were materially false and /or misleading. Through this fraud, Defendants caused Fidelity National stock to trade at artificially high prices during the Class Period.

5.     Investors began to learn about problems with the Worldpay integration and the underperformance of the Merchant Solutions segment on August 4, 2022, when Fidelity National announced that its Chief Financial Officer ("CFO"), James Woodall, planned to "step down" as Corporate Executive Vice President and CFO effective November 4, 2022. On this news, the price of Fidelity National stock fell more than 7%, from a closing price of $104.13 per share on August 3, 2022 to a closing price of $96.57 per share on August 4, 2022.

6.      Then, on November 3, 2022, the Company announced disappointing results for the third quarter of 2022, including that profit margins in the Merchant Solutions business "saw continued pressure in the quarter," resulting "in an overall adjusted EBITDA margin contracting 150 points year-on-year."  On this news, the price of Fidelity National stock declined approximately 28%, from a closing price of $79.47 per share on November 2, 2022, to a closing price of $57.18 per share on November 3, 2022.  Analysts reported the new Fidelity National management "recognize[d] the need to rebuild investor confidence."

7.      Finally, before markets opened on February 13, 2023, Fidelity National announced it would spin off Worldpay, and in the process, the Company recognized a stunning $17.6 billion write-down on the asset.  In response to this revelation, the price of Fidelity National stock fell more than 12%, from a closing price of $75.43 per share on the prior trading day of February 10, 2023, to a closing price of $66.00 per share on February 13, 2023.

8.      As a result of Defendants' wrongful acts and misleading statements, and the precipitous decline in the market value of the Company's stock, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act, (15 U.S.C. § 78aa).

11.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Fidelity National is headquartered in this Judicial District.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District, and many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District.

12.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.    Plaintiff Nebraska Investment Council is an unincorporated instrumentality of the State of Nebraska that has the statutory responsibility for the investment management of the assets of the State of Nebraska, including the public employee retirement plans administered by the Nebraska Public Employee Retirement System.  As set forth in the attached certification (Exhibit A), Nebraska Investment Council, on behalf of the Defined Benefit Plan, the Cash Balance Benefit Plan and the General Endowments, purchased Fidelity National common stock during the Class Period and suffered damages as a result

of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant Fidelity National is incorporated under the laws of Georgia, with its principal executive offices located in Jacksonville, Florida.  The Company's common stock is traded on the New York Stock Exchange (the "NYSE") under the ticker symbol "FIS."

15.     Defendant Gary Norcross ("Norcross") served as the Company's Chief Executive Officer ("CEO") from January 1, 2015 to December 15, 2022 and as Chairman of the Board of Directors from May 30, 2018 to December 15, 2022.

16.     Defendant James Woodall ("Woodall") served as the Company's Executive Vice President and CFO from May 18, 2013 to November 4, 2022.

17.     Defendant Stephanie Ferris ("Ferris") has served as the Company's President since February 8, 2022 and as CEO since January 1, 2023.  Ferris previously served as the Company's Chief Operating Officer from August 1, 2019 to September 2020 and as Chief Administrative Officer from September 2, 2021 to February 8, 2022.  Prior to that, Ferris served as CFO of Worldpay, and its predecessor, from April 26, 2016 until the closing date of the Worldpay acquisition by the Company on July 31, 2019.

18.     Defendants Norcross, Woodall, and Ferris (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of, *inter alia*, Fidelity National's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's

reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

19.    The Company and the Individual Defendants are collectively referred to herein as "Defendants."

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**Background**

20.    Fidelity National provides payment processing products and services to financial institutions and other types of companies. Over the past decade, Fidelity National grew its global footprint through dozens of acquisitions, including its 2019 merger with WorldPay that added merchant services to its broad suite of payment solutions.

21.    The Company operates in 3 segments: Banking Solutions; Merchant Solutions; and Capital Market Solutions. Merchant Solutions, the segment consisting of the Worldpay business, serves merchants by enabling them to accept, authorize, and settle electronic payment transactions, and accounted for approximately 30% of the Company's total revenue in 2021.

22.    On July 31, 2019, Fidelity National completed its acquisition of Worldpay, a provider of payment and technology services to merchants and financial institutions in the United States.  After closing, Fidelity National began integrating Worldpay into the Merchant Solutions business.  The Worldpay acquisition was worth $43 billion – the Company's largest acquisition to date – and made Fidelity National the largest processing and payments company in the world.  Indeed, in the press release announcing the Worldpay closing, Defendant Norcross stated that "the Worldpay acquisition is a demonstrable proof point in our overall growth strategy.  We are confident that our focus on innovating with purpose to advance the way the world pays, banks and invests will continue to deliver long-term value to our clients and shareholders."  Specifically, Fidelity National called for an "organic revenue growth outlook of 6 percent to 9 percent through 2021, in conjunction with $700 million of total EBITDA synergies from the combination of revenue and expense opportunities over the next three years" as Worldpay was integrated.

23.    Under GAAP, the general accounting standards used by U.S. companies, "goodwill" is an intangible asset recognized to reflect the difference between the purchase price of an acquisition target and the value of its identifiable net assets.  Goodwill puts a collective value on assets that are not individually itemized on a company's balance sheet such as customer relationships, key employees, and brand recognition.  Often, after one company acquires another, the acquirer records a large amount of the acquisition's value as goodwill.  Under GAAP, companies are required to periodically reassess the value they ascribe to goodwill and impair this goodwill value under certain circumstances that are indicative of underperformance by the acquired business.  Throughout the Class Period,

Fidelity National reported the valuation of its overall goodwill in filings with the SEC, which primarily consisted of goodwill from the Worldpay acquisition. The Company did not take any significant impairment charges related to the goodwill it assigned to the Worldpay acquisition during the Class Period.

### Defendants' Materially False and Misleading Statements Issued During the Class Period

24. On May 7, 2020, the first day of the Class Period, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2020 (the "Q1 2020 Report") signed by Defendant Woodall. The Q1 2020 Report included an income statement reporting the Company's net earnings of $18 million for the quarter ended March 31, 2020, and $51.8 billion in goodwill included as an asset on the Company's balance sheet as of March 31, 2020.

25. Appended as exhibits to the Q1 2020 Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendant Norcross and Defendant Woodall certified that "[t]he [Q1 2020 Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q1 2020 Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

26. Also on May 7, 2020, Fidelity National held an earnings conference call after releasing its first quarter 2020 results. During that call, Defendant Norcross claimed that the Company was "well down the path through the integration of Worldpay," and claimed the integration would "continue," and that the Company would "continue to execute on

integration initiatives to accelerate synergy achievement." Defendant Norcross further stated that Fidelity National would "build on [its] differentiation by developing cutting edge solutions through our modernization and innovation investments and continue to accelerate the integration of Worldpay."

27.    On August 4, 2020, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2020 (the "Q2 2020 Report") signed by Defendant Woodall. The Q2 2020 Report included an income statement reporting the Company's net earnings of $21 million for the quarter ended June 30, 2020, and $51.9 billion in goodwill included as an asset on the Company's balance sheet as of June 30, 2020.

28.    Appended as exhibits to the Q2 2020 Report were signed certifications pursuant SOX, wherein Defendant Norcross and Defendant Woodall certified that the "[t]he [Q2 2020 Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q2 2020 Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

29.    Also on August 4, 2020, Fidelity National held an earnings conference call after releasing its second quarter 2020 results. During that call, Defendant Norcross said that while Fidelity National "revenue faced headwinds, [it] expanded margins by 150 basis points as we continue to drive down our cost structures through the Worldpay integration initiatives as well as ongoing benefits from investments in technology and automation." On the same call, Defendant Woodall stated that the Worldpay "integration remains ahead of schedule as [the Company] saw ongoing traction in the bank referral channel as well as

continued cross sell wins for [its] Premium Payback solution."  On the same call Defendant

Woodall also claimed that in that quarter, "Merchant adjusted EBITDA was $331 million

representing significant margin expansion of 41% over the prior year period, primarily due

to the Worldpay acquisition."

30.    On September 9, 2020, Defendants Norcross and Woodall participated in a

conference call sponsored by Keybanc Capital Markets.  During that call, Defendant

Norcross represented that Fidelity National's integration with Worldpay "has been the

easiest integration [the Company] has done to date" and touted "Worldpay's continued

strength on the [customer] acquiring side."  He also stated that Fidelity National and

Worldpay were "very like-minded in how they approach markets and how they approach

technology and how they serve customers, and that like-mindedness also complemented

from a cultural standpoint that made [their] cultures aligned very well.  And so, then it

allowed the ease of being able to put this company together."

31.    On October 29, 2020, the Company filed with the SEC its quarterly report

on Form 10-Q for the period ended September 30, 2020 (the "Q3 2020 Report") signed by

Defendant Woodall.  The Q3 2020 Report included an income statement reporting the

Company's net earnings of $22 million for the quarter ended September 30, 2020, and

$52.6 billion in goodwill included as an asset on the Company's balance sheet as of

September 30, 2020.

32.    Appended as exhibits to the Q3 2020 Report were signed certifications

pursuant SOX, wherein Defendant Norcross and Defendant Woodall certified that the

"[t]he [Q3 2020 Report] fully complies with the requirements of Section 13(a) or 15(d) of

the [Exchange Act]" and that "[t]he information contained in the [Q3 2020 Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

33.    Also on October 29, 2020, Fidelity National held an earnings conference call after releasing its third quarter 2020 results.  During that call, Defendant Woodall claimed that the "Worldpay integration," was "more than two years ahead of schedule," and that the Company had "achieved $150 million in revenue synergies as we continue to see really strong traction with our premium payback solution," and that Fidelity National was "significantly outperforming [its] initial expectations for merchant bank referrals."  On the same call, an analyst asked if Defendants were still seeing e-commerce as a major opportunity for Worldpay.  Defendant Norcross replied that the Company's "current position in global [e-commerce] puts [it] at a very competitive advantage to compete and continue to win share . . . ..  [W]e're really differentiated in that space, continue to be the leader in global e-commerce and we continue to feel very bullish on where we are going with our sales wins."

34.    On February 9, 2021, the Company issued a press release announcing its results for the fiscal quarter ended on December 31, 2020, which included an income statement that reported the Company's net earnings of $102 million for the quarter ended December 31, 2020.  Also on February 9, 2021, Fidelity National held a related earnings conference call.  During that call, Defendant Norcross highlighted that the Company had "made exceptional progress in integrating Worldpay" stating that Fidelity National:

made great progress with the Worldpay integration, remaining well ahead of plan and exited the year generating more than $200 million in revenue synergies and more than $750 million in cost synergies. With this impressive momentum, we are excited to build on our strengths as we look ahead to accelerating organic revenue growth in 2021.

35.    On February 18, 2021, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2020 (the "2020 Annual Report") signed by Defendant Norcross and Defendant Woodall.  The 2020 Annual Report included an income statement that reported the Company's net earnings of $164 million for the year ended December 31, 2020, and $53.3 billion in goodwill included as an asset on the Company's balance sheet as of December 31, 2020.  The 2020 Annual report also claimed that the Company's "ability to innovate and scale digital payments and services," was a "competitive advantage."

36.    Appended as exhibits to the 2020 Annual Report were signed certifications pursuant SOX, wherein Defendant Norcross and Defendant Woodall certified that the "[t]he [2020 Annual Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2020 Annual Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

37.    On March 22, 2021, Norcross participated in the Bank of America Securities Electronic Payment Virtual Symposium.  In response to a question about the Company's accelerating revenue growth, Norcross boasted about the benefits to the Company of having completed the integration of Worldpay, stating, "our cross-sell wins have been very

strong coming out of the Worldpay integration." Norcross later noted that Fidelity National was very confident that its merchant business "long term could be a double[-]digit grower," even though Worldpay historically had single-digit revenue growth. Norcross also highlighted that "the fundamentals of putting the 2 companies together really has exceeded our expectations at this point. We're well ahead of process."

38.    On May 6, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "Q1 2021 Report") signed by Defendant Woodall. The Q1 2021 Report included an income statement that reported the Company's net loss of $370 million for the quarter ended March 31, 2021, and $53.1 billion in goodwill included as an asset on the Company's balance sheet as of March 31, 2021.

39.    Appended as exhibits to the Q1 2021 Report were signed certifications pursuant to SOX, wherein Defendant Norcross and Defendant Woodall certified that the "[t]he [Q1 2021 Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q1 2021 Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

40.    Also on May 6, 2021, Fidelity National held an earnings conference call after releasing its first quarter 2021 results. On the call, Norcross pointed specifically to the "synergies with the Worldpay integration" as providing a "significant contribution" to the Company's increased financial guidance. Further, Norcross claimed that Fidelity National was "emerging from the pandemic with an even stronger competitive position than when

[it] entered it," while then-President Bruce Lowthers claimed it was "very, very competitive."

41.    On August 3, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "Q2 2021 Report") signed by Defendant Woodall.  The Q2 2021 Report included an income statement reporting the Company's net earnings of $342 million for the quarter ended June 30, 2021, and $53.2 billion in goodwill included as an asset on the Company's balance sheet as of June 30, 2021.

42.    Appended as exhibits to the Q2 2021 Report were signed certifications pursuant to SOX, wherein Defendant Norcross and Defendant Woodall certified that the "[t]he [Q2 2021 Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q2 2021 Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

43.    Also on August 3, 2021, after announcing its second quarter 2021 results, the Company held an earnings conference call during which Norcross told analysts that "you're seeing us exceed our cross-sales and revenue synergies with the Worldpay integration."  In addition, Norcross noted the Company "had a record quarter from a sales perspective" due in part to the "revenue synergies across the Worldpay integration efforts."

44.    On November 4, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "Q3 2021 Report") signed by Defendant Woodall.  The Q3 2021 Report included an income statement reporting the Company's net earnings of $161 million for the quarter ended September 30, 2021, and

$52.8 billion in goodwill included as an asset on the Company's balance sheet as of September 30, 2021.

45.    Appended as exhibits to the Q3 2021 Report were signed certifications pursuant to SOX, wherein Defendant Norcross and Defendant Woodall certified that the "[t]he [Q3 2021 Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q3 2021 Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

46.    Also on November 4, 2021, Fidelity National held an earnings conference call for its third quarter 2021 results.  In his opening remarks, Defendant Norcross highlighted that:

> Revenue synergies related to our Worldpay integration increased to $150 million in the quarter, bringing the total to $600 million on an annual run rate basis. We remain on schedule to exceed $700 million exiting this year, beating our original target by 40%, while accomplishing this feat a year early.

Later on the call, Defendant Woodall informed investors that the completed Worldpay integration allowed the Company to continue exploring more acquisitions, stating "[y]ou probably also saw some emphasis there as we round out and complete the Worldpay integration. . . ..  We are very focused on completing each integration before we move to the next.  So we feel good about where we're at on that integration."  On the same call, Defendant Norcross claimed that the Company had "anticipated the changing competitive landscape and invested heavily in technology and innovation over the [previous] 5 years."

47.     On November 15, 2021, Woodall participated in the Citi's 11th Annual FinTech Conference.  In response to a question of what some of Fidelity National's target areas for new acquisitions would be, Woodall explained that "in the short term, we're probably not looking at anything transformational.  We're just completing the Worldpay integration work here, just finishing it up."

48.     The next day, on November 16, 2021, Norcross and Woodall presented at the RBC Global Technology, Internet, Media and Telecom Conference.  Norcross highlighted that "when you look at where we are on the Worldpay integration, we've got really Worldpay predominantly behind us now.  We've got all our segments really hitting on all cylinders[.]"

49.     On February 15, 2022, the Company issued a press release announcing its results for the fiscal quarter ended on December 31, 2021, which included an income statement reporting the Company's net earnings of $291 million for the quarter ended December 31, 2021.

50.     Also on February 15, 2022, during Fidelity National's earnings conference call for the fourth quarter and full year 2021, Norcross announced that the Company had "successfully completed the Worldpay integration nearly a year ahead of schedule, beating our initial revenue synergy target by 50% and more than doubling our initial expense synergy target," later emphasizing that the Company's sales team had "done an excellent job driving cross sales through the Worldpay acquisition."  In addition, as Norcross explained, "our success in revenue synergies with the Worldpay integration," will allow Fidelity National to "take advantage of a broader addressable market."

51.    On February 23, 2022, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report") signed by Defendant Norcross and Defendant Woodall.  The 2021 Annual Report included an income statement reporting the Company's net earnings of $424 million for the year ended December 31, 2021, and $53.3 billion in goodwill included as an asset on the Company's balance sheet as of December 31, 2021.

52.    Appended as exhibits to the 2021 Annual Report were signed certifications pursuant SOX, wherein Defendant Norcross and Defendant Woodall certified that the "[t]he [2021 Annual Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2021 Annual Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

53.    On March 9, 2022, Norcross and Woodall participated in Wolfe Research's Fintech Forum.  In response to a question about what positively surprised him in 2021, Norcross said that Fidelity National:

> really successfully completed the Worldpay integration. We blew out any of our operating synergies going into that, whether it was on expense takeout or revenue. Revenue exceeded well over $700 million across sales. We ended up getting over $900 million of cost takeout. So we feel great about that integration and how that went.

54.    On May 3, 2022, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2022 (the "Q1 2022 Report") signed by Defendant Woodall.  The Q1 2022 Report included an income statement reporting the

Company's net earnings of $121 million for the quarter ended March 31, 2022, and $53 billion in goodwill included as an asset on the Company's balance sheet as of March 31, 2022.

55.    Appended as exhibits to the Q1 2022 Report were signed certifications pursuant to SOX, wherein Defendant Norcross and Defendant Woodall certified that the "[t]he [Q1 2022 Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q1 2022 Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

56.    Also on May 3, 2022, during Fidelity National's earnings conference call for the first quarter 2022, then-President Ferris touted the "strength and differentiation of [Fidelity National's] e-commerce business."

57.    On August 4, 2022, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2022 (the "Q2 2022 Report") signed by Defendant Woodall.  The Q2 2022 Report included an income statement reporting the Company's net earnings of $280 million for the quarter ended June 30, 2022, and $52 billion in goodwill included as an asset on the Company's balance sheet as of June 30, 2022.

58.    Appended as exhibits to the Q2 2022 Report were signed certifications pursuant to SOX, wherein Defendant Norcross and Defendant Woodall certified that the "[t]he [Q2 2022 Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q2 2022 Report] fairly

presents, in all material respects, the financial condition and results of operations of the Company."

59.    The statements referenced in ¶¶ 24-58 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading.  Specifically, Defendants misled investors by: (1) touting the benefits of the Worldpay integration for the Company; (2) claiming that Fidelity National had "successfully completed the Worldpay integration"; (3) downplaying competition concerns in the Merchant Solutions segment; and (4) materially overstating the Company's earnings or materially understating the Company's net losses by improperly accounting for Worldpay's goodwill in violation of GAAP.  As a result, Defendants' positive statements about the Company's business, operations, and prospects during the Class Period were materially false and /or misleading.  Through this fraud, Defendants caused Fidelity National stock to trade at artificially high prices during the Class Period.

### The Truth Begins To Be Revealed

60.    Despite the Company's repeated assurances that the Worldpay integration was "successfully completed," investors began to learn of Fidelity National's struggles when the Company announced the departures of its CEO and CFO.  First, on August 4, 2022, Fidelity National filed a Current Report on Form 8-K with the SEC announcing the Company's second quarter 2022 results.  The 8- K included an announcement that Woodall planned to "step down" as Fidelity National's Corporate Executive Vice President and

CFO effective November 4, 2022, and that Erik Hoag ("Hoag") would be replacing him on that same day.

61.    On this news, Fidelity National's stock price dropped $7.56 per share, or more than 7 percent, from a closing price of $104.13 per share on August 3, 2022, to a closing price of $96.57 per share on August 4, 2022.  Despite the executive turnover, during the Company's accompanying earnings conference call, then-President Ferris proclaimed that Fidelity National is "hugely successful in terms of driving revenue synergies on the Worldpay transaction."

62.    In addition, on October 18, 2022, the Company issued a press release announcing that Ferris, who was appointed President of the Company in February 2022, would become the new CEO effective January 1, 2023.  As a result, outgoing-CEO Norcross, who had been with the Company since 1988 and in the CEO role since 2015, would become Executive Chairman of the Board of Directors upon the transition.

63.    The impact of the failed Worldpay was further revealed on November 3, 2022, when the Company announced disappointing results for the third quarter of 2022. During the earnings conference call, Norcross announced that profit margins in the Merchant Solutions business "saw continued pressure in the quarter" resulting "in an overall adjusted EBITDA margin contracting 150 points year-on-year."  Norcross explained "we are not pleased with the profitability performance of the business and are taking actions to address them."  In addition, the Company's new CFO, Eric Hoag, explained more specifically that the Company's Merchant Solutions segment suffered from a 430 basis-point margin contraction during the quarter.  However, despite the clear issues

with Merchant Solutions, including Worldpay, when asked about the Company's other cross-selling projects, Norcross noted that the Company has been "simply taking the success that we had with the Worldpay integration of cross-sales and amplifying that up to the next level."

64.    In response to these results, on the call, Baird analyst, David Koning, bluntly noted that "on margins . . . if we look first just at Merchant, it was close to 100% incremental margin in both 2020 and 2021.  And now this year it's closer to zero."

65.    Following the earnings conference call, analysts from Raymond James reported "a disastrous 3Q print that we can only hope was the kitchen sink and then some." Also, in that same note, analysts highlighted they were "particularly disappointed by merchant growth[,]" writing that an "enterprise transformation program . . . is a much-needed step in the right direction" for Fidelity National.  Further, analysts at UBS reported that the Company's "results missed our and Street expectations driven by underperformance from Merchant Solutions[,]" noting that "[w]hile we were expecting some form of medium-term guidance reset, we were still anticipating to hear about a path back to high-single digits for Merchant Solutions, which did not occur, leading some investors to wonder if there may be structural problems."

66.    On this news, Fidelity National's stock price dropped $22.29 per share, or over 28% percent, from a closing price of $79.47 per share on November 2, 2022, to a closing price of $57.18 per share on November 3, 2022.

67.    Despite these revelations, Defendants continued to obscure the extent of the Company's financial issues.  On November 4, 2022, the Company filed with the SEC its

quarterly report on Form 10-Q for the period ended September 30, 2022 (the "Q3 2022 Report") signed by its new CFO Hoag.  The Q3 2022 Report included an income statement reporting the Company's net earnings of $254 million for the quarter ended September 30, 2022, and $51 billion in goodwill included as an asset on the Company's balance sheet as of September 30, 2022.

68.    Appended as exhibits to the Q2 2022 Report were signed certifications pursuant to SOX, wherein Defendant Norcross and Hoag certified that the "[t]he [Q3 2022 Report] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q3 2022 Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

69.    Then, on December 15, 2022, Fidelity National announced that it had initiated a "comprehensive assessment of the Company's strategy, business, operations and structure" with a "focus on identifying and optimizing incremental revenue generation, margin improvement and cost reduction opportunities."  Notably, the Company also announced that CEO Norcross would "depart" as CEO and a Board member earlier than anticipated – effective December 16, 2022 – and that he would not be appointed Executive Chairman of the Board as previously mentioned.

70.    Finally, before the markets opened on February 13, 2023, Fidelity National filed a Current Report on Form 8-K with the SEC announcing the Company's fourth quarter and full year 2022 results.  The Form 8-K included a press release that stunned investors by disclosing that the Company would be getting rid of its Merchants Solutions business – namely Worldpay – and "recorded a non-cash goodwill impairment charge of

$17.6 billion related to Merchant Solutions reporting unit in the quarter." This massive write-down constituted more than 40% of Fidelity National's purchase price for Worldpay just a few years earlier.

71.    Credit Suisse and Citigroup analysts downgraded Fidelity National stock in the wake of the news. Other analysts were critical of the Worldpay acquisition. Mizuho analysts stated that the spinoff meant that the acquisition of Worldpay in 2019 "was a huge failure," explaining that Fidelity National's merchant business has "deteriorated considerably since the merger[.]" Additionally, analysts at Morningstar blamed the spinoff on the poor integration of the Company's Merchant Solutions business, writing that Fidelity National's "recent issues stem more from operational missteps and that the strategy behind the combination was not necessarily flawed from a long-term perspective." In a report titled "FIS: The Struggle is Real," Wells Fargo analysts reported "The $17.6B impairment charge and the volume growth in Merchant both stood out." Argus Research wrote "the unwinding of the large Worldpay acquisition is a black eye on the company's former strategy."

72.    On these revelations, the price of Fidelity National stock dropped $9.43 per share, or more than 12 percent, from a closing price of $75.43 per share on the prior trading day of February 10, 2023 down to a closing price of $66.00 per share on February 13, 2023.

## CLASS ACTION ALLEGATIONS

73.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased Fidelity National common stock between May 7, 2020 and February

10, 2023, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

74.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, Fidelity National common stock actively traded on the NYSE (an open and efficient market) under the symbol "FIS."  Millions of Fidelity National shares were traded publicly during the Class Period on the NYSE.  As of February 22, 2023, the Company had more than 591 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Fidelity National or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

75.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

76.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

77.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

(b)    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(c)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Fidelity National;

(d)    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Fidelity National;

(e)    whether the market price of Fidelity National common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)    the extent to which the members of the Class have sustained damages and the proper measure of damages.

78.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively

small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## UNDISCLOSED ADVERSE INFORMATION

79.    The market for Fidelity National's common stock was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Fidelity National's common stock traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased Fidelity National's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Fidelity National and have been damaged thereby.

80.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Fidelity National's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Fidelity National's business, operations, and prospects as alleged herein.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period directly or

proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchase the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

81.     As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

82.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Fidelity National, their control over, receipt, and/or modification of Fidelity National's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning Fidelity National, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

83.     As a result of their purchases of Fidelity National common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

84.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Fidelity National who knew that the statement was false when made.

## LOSS CAUSATION

85.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, i.e., damages, suffered by Plaintiff and the Class.

86.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of Fidelity National's common stock and operated as a fraud or deceit on the Class.  When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Fidelity National's stock fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

87.    The market for Fidelity National stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Fidelity National

common stock traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of Fidelity National common stock and market information relating to Fidelity National and have been damaged thereby.

88.     At all times relevant, the market for Fidelity National common stock was an efficient market for the following reasons, among others:

(a)     Fidelity National was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Fidelity National filed periodic public reports with the SEC and/or the NYSE;

(c)     Fidelity National regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Fidelity National was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

89.     As a result of the foregoing, the market for Fidelity National common stock promptly digested current information regarding Fidelity National from all publicly available sources and reflected such information in Fidelity National's stock price. Under

these circumstances, all purchasers of Fidelity National stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

90.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

91.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the

investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Fidelity National common stock; and (iii) cause Plaintiff and other members of the Class to purchase Fidelity National common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

93.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Fidelity National common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

94.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Fidelity National's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Fidelity National's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in

order to make the statements made about Fidelity National and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

95.    Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

96.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or

recklessly and for the purpose and effect of concealing Fidelity National's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

97.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Fidelity National common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased Fidelity National common stock during the Class Period at artificially inflated prices and were damaged thereby.

98.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Fidelity National was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their

Fidelity National common stock, or, if they had purchased such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

99.    By virtue of the foregoing, Fidelity National and the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

100.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**Against All Individual Defendants**

101.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

102.    The Individual Defendants acted as controlling persons of Fidelity National within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading

prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

103.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

104.    As set forth above, Fidelity National and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## **PRAYER FOR RELIEF**

105.    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

106.    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

107.    Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

108.    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

109.    Awarding such other relief as this Court deems appropriate.

## **JURY DEMAND**

110.    Plaintiff demands a trial by jury.

Dated: April 28, 2023

Respectfully submitted,

**GRAYROBINSON, P.A.**

By: */s/ David S. Oliver*
David S. Oliver (FL Bar No. 521922)
301 East Pine Street
Suite 1400
Orlando, Florida 32801
Telephone: (407) 843-8880
Facsimile: (407) 244-5690
david.oliver@gray-robinson.com

**LABATON SUCHAROW LLP**
Eric J. Belfi
Michael P. Canty
Francis P. McConville
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 8180-0477
ebelfi@labaton.com
mcanty@labaton.com
fmcconville@labaton.com

*Attorneys for Plaintiff*

**CERTIFICATION**

I, Mike Hilgers, on behalf of Nebraska Investment Council ("Nebraska"), hereby certify as follows:

1.        I am the Attorney General of the State of Nebraska.  The Attorney General is statutorily authorized to represent Nebraska in this litigation.  I have reviewed a complaint prepared against Fidelity National Information Services, Inc. ("Fidelity National") alleging violations of the federal securities laws, and authorize the filing of this pleading;

2.        Nebraska did not purchase common stock of Fidelity National at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.        Nebraska is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Nebraska fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.        Nebraska's transactions in Fidelity National common stock during the Class Period, through the Defined Benefit Plan and Cash Balance Benefit Plan (commingled) and the General Endowments, are reflected in Exhibit A, attached hereto;

5.        Nebraska sought to serve as a lead plaintiff in the following class action filed under the federal securities laws during the last three years:

*City of Miami Fire Fighters and Police Officers Retirement Trust v. Okta, Inc.*, No. 3:22-cv-2290 (N.D. Cal.)

6.        Beyond its pro rata share of any recovery, Nebraska will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is

true and correct this 28th day of April, 2023.

DocuSigned by:

*Mike Hilgers*

A7E09A8BAEC34AC...

Mike Hilgers
*Attorney General of the State of Nebraska*
*on behalf of Nebraska Investment Council*